The case on the call this afternoon is 5-14-326, S.A.D., counsel ready to proceed? I got the wrong case? Oh, okay. You may proceed. May it please the court? Counsel. Counsel. My name is Amanda Biasigot and I'm here today on behalf of the appellant, Andrew Davey. We're here, as I'm sure the court is aware, on a family law case in which the trial court determined residential custody of the minor child, S.A.D., would be in the care of the mother. And the issues before this court are twofold. One, whether or not the trial court erred in naming the mother the residential custodian of the minor child, Sierra. And secondly, an alternative issue as to whether the trial court erred in denying the father, Andrew, midweek overnight visitation once Sierra begins school. So, with regard to the first issue before the court, it's our position that the court did err in determining that the mother, Melissa, should be the residential custodian of the minor child pursuant to a joint custody agreement. And that the factors set forth under the best interest of the child standard in Section 602, in fact, specifically fall in favor of the father. This case originated under the Parentage Act. These parties were not married. Of course, the Parentage Act then defers to Section 602 under the Illinois Marriage and Dissolution of Marriage Act. For consideration of custody and visitation matters and the best interest of the minor children. The specific factors that heavily favored the father in this case are several. Factors 3, 4, 5, and 8 are the ones we specifically covered in our brief to the court. And the trial court, interestingly enough, said in its opinion that it found that 3, 4, and 8, specifically, it found weighed heavily in favor of the mother. We respectfully disagree with that opinion and believe that the court's error was against the manifest weight of the evidence and are asking it to be overturned. In this specific case, factor 3, with regard to best interest of the minor children, talks about the interreaction and interrelationship of the parent, the children, the siblings, and other pertinent persons in this child's life. And as set forth in our brief, that there were multiple facts recited and testimony given in this case that these factors weighed heavily in favor of the father. Both of these parents had been involved in this child's life. In her early life, they resided in the father's home, his home that he had owned for several years. He has an older child that had a relationship with this child. The mother had a child of her own whom custody had been taken away from and who did not have much relationship with this child, Sierra, at that point in time at all. There was further testimony given that the father's family, specifically his mother and cousins and other family members, lived in relation to this child and had close relationships with Sierra during this time frame. That there was little extended family contact on the part of the mother's side of the family because her family lived outside of the area and she had difficulties with her family and did not have a very close upbringing by them. So we believe the interaction and interrelationship of the parents, siblings, and other persons specifically favored the father in this case. There was also further specific testimony regarding the high level of involvement that the father had with this child as a very young child. Activities that they were involved in together. Events that they attended. The close bond that they shared. That the child tended to go to him in a room as opposed to the mother. Just a very close kind of daddy's girl relationship with the evidence presented to the court. In contrast to not a lot of testimony from the mother about her relationship with this child, special bond with this child, and things of that nature. Factor four in her best interest of the child regarding the child's adjustment to homeschool and community also heavily favored the father in this case. The minor child, Sierra, had grown up in the father's home. It was a home that he had owned for many years. It is where the mother moved into when she was pregnant. Then the child then subsequently lived after the child was born with the mother. How long was this? How long was what? I'm sorry? How old was she when she left the father's home? She was, I believe, four years old, Your Honor. Approximately four years old when the parties separated. So up until that had lived in the father's home. You know, a large home with a yard. You know, the child. Chickens. Chickens, yes. Chickens, a lot of testimony about the child enjoying outdoor activities, you know, having play equipment there. She was a good Southern Illinois outdoor child, as we would say around here. So a lot of testimony regarding certainly the child's adjustment to her home, her community, was the Marion area. That's where she lived. It's where the father lived. It's where the grandmother lived and would watch the child on occasions where she would visit the cousins. The child is not of school age currently, but certainly there was testimony given regarding the father wanting the child to attend school in Marion. The mother eventually moved to Heron when the parties separated, and there was testimony given that the mother was in basically a somewhat temporary residence in a trailer. She had just found something quick so that she had a place to move into. She didn't necessarily want to stay in that location. Hadn't really looked at that location. Wasn't really picking that place for choice of school or any other reason. You know, basically kind of mother's in her own temporary situation was the testimony before the court at that point in time herself once the parties separated. You know, certainly the child has a good relationship, you know, with the mother, and there is a relationship there. But in terms of any extended persons relating to the mother, it just wasn't there, and there wasn't any extended persons. You know, the child was only put in daycare by the mother at some point in time after the parties separated. So the child had only been in daycare for a couple of months, I believe, at the time that we went to trial in this case. So we believe that that factor four regarding the child's adjustment to the home, school, and community also would heavily weigh in favor of the father as well. Though, ironically, the trial court indicated they thought that fell in favor of the mother. One factor that the court did not cite, the trial court as a basis for its decision that we do think is very important, is factor five regarding the mental and physical health of the parties. There were testimony and certainly admissions by the mother in this case regarding her own mental health issues. She has a history of some mental health difficulties as a youth had attempted a suicide. She admitted to having attempted suicide in late 2012. She admitted to having been diagnosed with bipolar within six months of being in court for this case, that she had manic episodes, that she had difficulties falling asleep. She would fall asleep at the drop of a hat, which she admitted. There was testimony from the father and his mother both supporting that, and she admitted that was the case and said it stemmed from some type of thyroid issue. And again, supposedly all of these things she's gotten taken care of within, you know, a couple of months of being in trial. There was nothing in the record, or was there anything in the record, about the kind of medication that she was now taking and its effectiveness? There was not outside of, the only thing in the record is in terms of the testimony given by the parties regarding the difficulties she had had or that had been witnessed by Mr. Davey, her behavior and her admissions. But did anyone say, it's better? Did anyone say medication is working? Oh. I mean, all I could see is she's on medicine. Mm-hmm. Oh, I think that's the extent of her testimony and information is she's fine now. And the sleeping, is it true that she fell asleep and allowed this three-year-old at that time to just wander in the house? I think that was, I think, the testimony that was presented to the court was that that had happened. The child was, you know, basically somewhat unattended, and she admitted to having these episodes where she could, you know, fall asleep at just kind of any point in time and said it stemmed from some type of a thyroid issue. So, again, very, you know, concerning issues that we don't believe the trial court took into account in order to determine whether or not this person should be the continuing permanent residential custodian of this minor child. Was there any evidence on the record as to whether she stayed on her medications? The only evidence on the record is her stating that she was getting treatment and that now she was basically fine. I mean, that was essentially, you know, the evidence presented is everything's okay now. This all just happened, but everything's fine. There was also testimony from her that she admitted that these problems had been part of the reason that she had difficulties with the father of her other child that she lost custody to within the last year from a different case in Williamson County. She had lost custody of her older daughter and was actually not having any kind of visitation with that child at all at the time that we were in trial, not having any kind of overnight. I think she was seeing her on a very limited basis at that point in time. So, again, a big factor in terms of the father's eyes and what we think truly concerns the best interest of this child in terms of making a permanent, you know, award and consideration taken into account the stability of this child that we don't believe was considered by the trial court. The next large, the last factor, the factor eight was regarding the willingness of each parent to facilitate and encourage a relationship between the child and the other parent. And that factor as well, we believe heavily weighs in favor of the father. There was evidence presented to the court in terms of the difficulties whenever the mother left with the minor child and the father didn't know, her hiding the minor child, not telling her where the child was, took her to Chicago, didn't tell him when she got back. And then that type of conduct continued on after the party's separation. She continued to deny him contact for almost a full month. She would not respond to texts or communications. When we got a court order for temporary, with the temporary schedule established, she continued to fail to inform him when she got a job, when she went to work, what her schedule was. She worked evenings and left the child overnight with the daycare provider who could only watch as a friend and not be a daycare to watch this child overnight. Never informed him that she needed care. He did not know the child was in daycare up until she asked him to pick the child up from daycare right before trial. And apparently she had enrolled the child a couple of months before that. She was taking the child to the doctor, not keeping him informed. He found out only at trial that the child was recommended to have speech therapy treatment. And he's a therapist himself. He's an occupational therapy assistant himself, so he would have some knowledge and familiarity with that. But none of that was disclosed to him. She didn't discuss any of that with him. You know, if the parties are, if they still attended the same church, that she would keep the child, you know, from talking to him. It's that type of behavior that we believe demonstrates that she was not willing to continue to facilitate a relationship or is not the best person that he would be better at trying to facilitate a relationship between the child and the other parent. She did not seem to want to keep him involved in this process at all. There was a lot of testimony before this court regarding Andrew and his relationship with Sierra, his close relationship with her, his close bond, details of all the things they did together, details about his house, the stability of his job, the stability of his relationship with this child, the stability of owning his own home, and being involved. You know, the court, under the Fahey case, decides that you can look at other factors as well as those factors cited under 602. And I think stability is one of the hugest issues that runs through, yes, to a certain extent, those factors listed under the statute, but I think it's a factor in and of itself in determining where it is that you're going to permanently place the child and what is in that child's best interest. You know, because you're setting a ruling here that then can't be modified in terms of who the residential custodian is for another two years. So you truly need to be, the court truly needs to be looking at this evidence and determining, okay, is this for the long term, you know, who it is that is going to be the permanent best custodian for this child. And certainly in terms of stability of life, of home, of mental health, those factors all weigh heavily in favor of the father and not in favor of the mother in this case. Certainly her living situation was precarious, not the best. There was no testimony given about activities that the child did with the mother, their relationship, if there's a yard. You know, any of those things. You know, is that supposed to be presumed? Are we just supposed to presume that because she's the mother that she has a close relationship with the child? That's not the case. You know, you can't presume that, you know. There just wasn't evidence there to support that there was a close relationship between this mother and child than there was with the father or that she had the means and the ability and the stability necessary to be the custodial parent. What is the relationship now between the child and Lily? Is that her name, Lilith? Lilith, Lily. I don't know outside of us being in court, Your Honor. Outside of that at this point. But was there a problem that the two girls, at least Lily, has behavior problems? She's destructive. That was the testimony in court, and there was testimony that Melissa was trying to have them separate and be separate from each other in order for her to try to, I believe, establish a bond again with Lilith. Has there ever been a significant period of time after she was taken away in which Melissa was not visiting at all with her? Was the evidence of the record. Okay, thank you. Thank you, counsel. Have a good one. Thank you. May it please the court. Counsel. My name is Norman Minor, and I'm here on behalf. We're recording. I know it's recording, but we're recording it if you wanted to. I'm here on behalf of Melissa Simpson, the mother of this child. And may it please the court, to answer your last question that you asked, she has a very close bond with Lilith, Lily, at this time. And Lily would not visit with the mother because she did not like Mr. Davies. And while she was living with Mr. Davies, she refused to be there. But she does have a very close relationship with the child. In the 30-some-odd years that I've been practicing family law, Judge Moore, the Honorable Judge Moore, is probably the most thorough judge that I've had the privilege to be in front of. He takes time. He listens. He pays profuse notes. And he pays attention to the evidence. He pays attention to the witnesses. In this particular case, Judge Moore heard this case twice. He heard the original custody hearing. Then he heard it again during the motion to reconsider. He's the one who prepared the judgment himself, clearly indicated he had clearly paid attention to the evidence, to the witnesses, and to the statutory factors. I'll tell you that Mr. Davies here has had such a long, loving relationship with this child. However, this child just turned five in September. Until she was three-and-a-half years old, he wouldn't even allow his name to be placed on the birth certificate. What does that have to do with the relationship? I saw that in the brief. But because somebody signs a piece of paper, does that mean they don't hug the child? He didn't acknowledge that it was his child for the longest time. He wasn't sure. She lived in the home? Yes. He cared for her? He developed a relationship with her? He didn't do most of the primary care, Your Honor. Well, she worked at night, didn't she? Yes, but he worked during the day. Right, so there was kind of a switchover where he had to be responsible, then she had to be responsible. He had the child at nighttime. I understand the fact that you don't sign a piece of paper doesn't mean you don't hug your child. No, I'm not saying he doesn't love the child. I'm just saying he wouldn't even recognize it was his child until she was three-and-a-half years old. The only witness that was before Judge Moore that didn't have any interest in this case was the daycare provider. Her name was Belinda DePue. She testified this child has a very close bond with her mother, has a very good relationship with her mother, and is a very happy child and a well-adjusted child. The mother has been the one who has taken the primary care of this child. She's the one who tends to all of her doctors, her dentists, her schooling. So the father had to work during the day. He didn't have the time. He couldn't even stay in the dentist's office more than 15 minutes because he had to get to work. The mother is the one who has found a job that she can set her own hours so that she can take care of this child's needs for medical, for the dental, for schooling, any necessity that comes up. She has a job where she can set her own hours for that. The father can't take off work. The father testified that his plans are that his mother will be the daycare provider for this child should he have custody. His mother didn't testify. She was very negative about the mother of this child, and not one who would be likely to encourage a close relationship between the child and her mother. Mr. Davies also has been very negative about the mother, and I don't believe he would be very well prepared to encourage a close relationship between the child and the mother. They want to talk about the other case, the other child. That was a different court case, a different judge, and a whole different matter than what this one was. And, yes, that child did have some problems. And, yes, the mother has also had some problems. But so does Mr. Davies. Mr. Davies wouldn't pay child support. He's paid $150 payment for child support. You would agree that that's a lot different than being bipolar and taking medication for mental health. I believe on physical matters, his health is worse than hers. Why is that? Because he has diabetes, and he has all kinds of problems that he has to take medication for. So his health problems are worse than hers are. Is that in the record? Yes, it is. Does it impair his ability to work every day? Apparently, because that's one of the reasons why he said he could only make $150 payment on child support. And one time, because part of it was because of his health, he didn't have money to afford it. So he does have that kind of health problem. Did anybody set an early child support schedule? Was there a child support schedule that he didn't follow? No. He said that he didn't pay support because nobody told him he had to. I would think any parent would know it's their obligation to pay for their child. But he said because nobody told him he had to. You did claim, as did your client, that they bought clothing and things for the child when the child was with each of them, right? My client has been a lot more positive about the father than the father has been about her. Yes. My client's the one who really wanted the joint custody because she wants both of them to share this child. She always has. She's a very stable girl. You asked about the medication. She takes her two days, and she's doing very well with it. She's not having any problems at all. I've seen her and the child in my office recently. In fact, I've seen her with the other child in my office recently, and they're all doing very well. Even the father testified that this child was a very happy child. But the mother's the one who had her during the day. He had her at night while she was sleeping. So the child does have a very close bond with her mother. The daycare provider, would she testify? Yes, she did say that one night, as a friend, she kept this child overnight with her as a friend, not as a daycare provider. But Mr. Davies, he's not been that active with this child, regardless of what they're saying. And the evidence was clear that he has been. And for her taking the child and hiding the child, not true. She went to Chicago. Mr. Davies ordered her to get out in two days, out of his home. She had no one here to help her. She went to Chicago, he knew that, to get her parents, to get her brother to come back and help her move. They say she doesn't have a relationship with her parents, but her brother didn't hesitate one minute to come back to Marion and help her move her stuff out of the house. He made it very difficult for them, but they did come down and did help. The brother? I'm sorry. The brother? Yes, the brother did. The argument you made is contested in the record, or at least in the briefs, I should say. She had had two affairs while living with him, right? And when he found out about the second one, he told her to get out. No. That's not true? No. That's what's in the brief and it's not true? No. Okay. And she did take him, the child, in the middle of the night, right? No, she took the child at 9.30. He was up walking around his room. Okay, 9.30. She didn't tell him she was taking the child? He told her to get out. But she didn't tell him she was leaving. He knew she was. He was awake. He was up in his room. He knew she was taking the child with him. Okay. Did she tell him she was leaving? Yes, she told him she was leaving. She went in and told him. She testified to that.  That's what I'm trying to find out from you, because there seems to be two versions. I'm trying to get to the... Exactly. Like most mothers, she was not going to leave that home without her child. And he was up. He was walking around his room. She told him she was leaving, and he knew she was taking the child. He filed immediately when she went to Chicago to bring her brother back there to help her move. He filed immediately for a motion to have her brought back. So he was well aware of where she was. And she did stay a couple of days with her grandparents to visit. She doesn't get to see her grandparents very often because of the distance between Chicago and Marion. So the child did stay and visit with her grandparents for a couple of days. Wasn't hiding the child from Mr. Davies at all. She's always encouraged a good relationship. Melissa Simpson wants this child to have both parents. That's why she's the one who insisted on joint custody. She wanted this child to have a father. So she wouldn't object to adding back the visitation that the court diminished? The judge did go back on the motion to reconsider. He did order overnight visitation during the week, which is not at school age. Didn't he order less visitation when the child begins school? No. He just ordered the overnight visitation during the school break. It could be overnight. He didn't think it was in the best interest of the child to have overnight visitation while she was in school. But, no, he added more, didn't take any away. His original order was that he would have either Tuesday or one day during the week for certain hours, between one hour and the other. He did go back and modify that to add overnight when the child was not in school. So he added some, not taken away. But when the child's in school, less? It goes back to the same original one hour until bedtime. And would you object to an overnight visitation during school? No, I wouldn't. But he lives, he doesn't, I don't think he can get the child to school. Because he lives in Marion and works in Anna. He has a long drive to work. So I don't think he's going to be in a position to get the child to school. But, no, I wouldn't object. He wants to see if he can make sure he gets the child to school. I don't have an objection. My client wouldn't object if he could get her to school. I just believe that Judge Moore considered the evidence very closely. And I believe it's very similar to what this court held in 2001. In that, in the case of the immigrant marriage of default, where this court held that child custody termination rests largely within the broad discretion of a trial judge. And the result reached by the trial court in a child custody case has given great deference because it is in a better position to evaluate the credibility of the witnesses and the needs of the child. That was a 2001 case. So the law is fairly close now as it was 13 years ago. I do believe that the judge has broad discretion. I believe this judge made a very careful consideration of all the evidence, heard all the evidence, and he was the one who did weigh the credibility of the witnesses. And as I said, there was only one witness that didn't have an interest in this case, and that was the daycare provider. Thank you. Rebuttal. Yes, the court, I'm sure, has the briefs of the parties and has the record of the witnesses to cite because I heavily disagree with some of the factual statements that were made by Ms. Minor as to what is in the record and what is not in the record. I did a very thorough recitation of the facts in my brief, trying to cite testimony pages from both parties to corroborate what specific of these incidents were verified by both parties. And I won't waste my time with going into that, but the information that was just given to you is not reflected in what the facts of this case are because there were many, many, many admissions made on the part of Ms. Simpson in regard to leaving, that she didn't go and tell him that she was leaving and taking the child with her no matter what time of night it was. There's just numerous, so I won't go into that. I agree with what Justice Cates was saying. In my opinion, there are several issues that are red herrings in this case that I believe, unfortunately, Judge Moore bought into to a certain extent. It is irrelevant when a voluntary acknowledgment of profanity was signed. I believe the whole child support issue is an entire red herring. There was no order in this case outside of one child support payment that was set up at the time that Mr. Davey was off of work recovering from a gallbladder surgery. Obviously, that's not a significant health issue, except that specifically at that time, he was not working and was off because of having gallbladder surgery. The schedule that was entered in this case was he had this child every Tuesday and Thursday, overnight, and every other weekend. That's pretty close to having equal time, but yet we're harping about child support. And the evidence before the court was that he didn't even know the child was in daycare to know that there was even a daycare bill to pay. She didn't ask him to pay it. She never gave it to him. She didn't tell him the child was in daycare. So therefore, how do you know to pay any expense? He did, in fact, provide multiple things for her, anything the child would need while that child was in his care, which was virtually half of the time. The daycare provider that Ms. Miners mentioned is the only unbiased person. It's a person who had known Ms. Simpson for, what, approximately two to three months and can only testify as to her intermittent contact in terms of pick-up and drop-off of what Ms. Simpson's relationship was with this child. That's the extent of her knowledge of these parties in this child and what the relationship and the situation was with all of these parties. These parties and parents had a division of labor that they used. They worked opposite shifts. They cared for the child. Both parties admitted they both provided care for the child. No one did more than the other. They just did it in different shifts, as all parents do, in trying to work with each other. And, you know, if you're working during the day, then obviously it's the other one that's going to take the child to a doctor during the day. It only makes common sense. It doesn't mean you're not involved. It doesn't mean you don't want to be involved. It doesn't mean you're not a primary caretaker. And the evidence was that Ms. Simpson would be sleeping for a significant portion or part of the day whenever she had the child. So I believe the evidence is clear. With all due respect to Judge Moore, I do not believe that his assessment of the case was correct. I do not believe that he weighed the evidence, and I don't believe that the factors that he says favor the mother specifically, in fact, favor the father. And I find it significantly disturbing that there was no consideration to the instability and mental health issues on the part of Ms. Simpson that had only recently been dealt with. So I believe that the Court erred in its decision that it should be overturned, that it was against the manifest weight of the evidence. And I certainly don't believe that there was any evidence to take overnight visitation away from this father during the school year in the event that the custody award is not overturned. You know, my view of this case is, I think, have we gone back to the archaic notion that just because she's the mother, she must be the one who's the custodian, and heaven forbid, can a father actually do anything and watch a child overnight and get a child to school in the morning? That's what this case reeks up to me. There is absolutely no evidentiary basis for the Court to have taken away overnight visitation, which both parties agreed to, testified aground and agreed to. And he first didn't include it in his order. Then I had to point out that both of us had both put it in our submitted proposals. So then he added it back in. We had nothing in there about taking away overnights when the child started school. He did that himself based on no further evidence outside the hearing we originally had, the proposals that we submitted both having it in there. I think that, again, is just reflective that he's viewing it with an archaic notion that, oh, it's the mother, and so she should have custody, and, you know, he's going to get every other weekend and a night during the week. We've moved beyond that, Your Honors. We'd ask that the Court's decision be overturned. Thank you, Counsel. The case will be taken as advised. You will be notified in due course.